UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-4182-CIV-MIDDLEBROOKS/BANDSTRA

MERRILL W. CREWS,

    Plaintiff,

vs.

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY,

    Defendant.

_____/



## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION TO COMPEL DISCOVERY SERVED JANUARY 2, 2001

Plaintiff Merrill Crews hereby files this Reply Memorandum in support of Plaintiff's Motion

to Compel Discovery.  For the reasons stated both here and in Plaintiff's motion, the Defendant

should be ordered to comply with the Plaintiff's outstanding discovery requests.

### INTRODUCTION

Since the filing of Plaintiff's Motion to Compel, the Provident Life and Accident Insurance

Company ("Provident") has produced most of the documents it had improperly withheld.  Only the

following items remain at issue:

1.     The Memorandum with attachments from Sergio Cabanas to Tammy Kidwill, dated 2/24/00 and listed in Defendant's Privilege Log as Document Nos. 29 and 32.[1]

2.     Defendant's Claims Handling Policies and Procedures/Procedure Manuals

3.     Better Answers to Plaintiff's Interrogatories Nos. 3, 5, 6, and 7

---

[1]     The Defendant has advised that Nos 29 and 32 describe the same 2/24/00 Cabanas Memorandum, but with different, as-yet unidentified attachments. Since the attachments are not identified, Plaintiff asks the Court to compel production of both documents.

**NEEDLE GALLAGHER & ELLENBERG, P.A.**
**1401 Brickell Avenue ◆ Suite 900 ◆ Miami, Florida 33131 ◆ (305) 530-0000**

In opposing this discovery in its Memorandum in Opposition, the Provident has raised three novel arguments: First, it has tried to narrowly restrict the Court's review of its actions by alleging that the Court is limited to Florida law and not Federal law in evaluating the Provident's work product objections. Second, it has argued that the Court should apply a standard of admissibility and not relevance to discovery. Third, the Provident has attempted to shift the burden of proof away from itself as the party opposing discovery. All are wrong.

First, with respect to Defendant's work product objections, "the work product doctrine is a limitation on discovery in federal cases, and *federal law provides the primary decisional framework*." *Auto Owners Ins. Co. v. Totaltape, Inc.*, 135 F.R.D. 199, 201 (M.D.Fla. 1990), citing *Hickman v. Taylor*, 329 U.S. 495, 512 (1947). (emphasis added). The Provident elected to remove this case from state court to federal court, and in so doing they chose to subject themselves to federal law on the issue of the work product doctrine. They cannot now be heard to complain that it is less favorable to them than state law on this issue.

As for the Court's standard of review, Fed.R.Civ.P. Rule 26(b) provides that "Parties may obtain discovery regarding any matter, not privileged, that is *relevant* to the claim or defense of any party....*Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence*." (emphasis added). In its Memorandum in Opposition, the Provident repeatedly (and wrongly) speculates about what may happen at trial if it is ordered to disclose one memorandum, a still unidentified number policies and procedures, and answer four interrogatories. Trial is nine months away and the admissibility of evidence will be governed by the Federal Rules and any motions *in limine* granted by the Court at that time. We're now engaged in discovery, and the standard for production of documents in discovery is relevance, not admissibility.

Third, the party opposing discovery or asserting a privilege always bears the burden of substantiating its objection. See, e.g., *Barclays America Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984); *City of Wichita v. Aero Holdings, Inc.*, 192 F.R.D. 300, 302 (D.Kan. 2000).

## MEMORANDUM OF LAW

The Plaintiff's Reply Memorandum is limited to only those three items remaining at issue and those arguments raised by the Defendant in its Memorandum in Opposition:

1.      The Cabanas Memorandum dated 2/24/00. This document is a report of an interview *with the Plaintiff* written by the interviewer, Provident employee Sergio Cabanas. Attached as Exhibit A is a recently disclosed Provident Memo of Telephone Conversation dated 1/20/00 from Claims Adjuster Tammy Kidwill summarizing the voicemail message she received from Sergio Cabanas following this interview. It states:

> "He [Cabanas] met with named at 3:30 p.m. and [illegible] finished interview. It was a good interview – insured was very cooperative. Sergio inquired about insured's work history....*He will have report soon.*" (Emphasis added).

The Cabanas Memorandum at issue is the only report from Sergio Cabanas identified by the Defendant. It contains the Plaintiff's statement. No other document from Sergio Cabanas has been produced or identified. Even though it contains the Plaintiff's statement and was prepared in the ordinary course of the Provident's claims handling – some two months before the Plaintiff's claim was even denied – the Provident claims the document is work product.

The first question for the Court with respect to the Cabanas Memo is whether this document is work product at all. Work product privilege only attaches at the point where the probability of litigating a claim is substantial and imminent. *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (S.D.Ga. 1982). Documents like the Cabanas Memo that are prepared by an insurer before a claim

is denied have generally not been considered work product. See, e.g., *Stout v. Illinois Farmers Ins. Co.*, 150 F.R.D. 594, aff'd 852 F.Supp. 704 (S.D.Ind. 1993) (documents prepared by insurer between date of loss and date claim denied not entitled to work product protection); *Nicklasch v. JLG Industries, Inc.*, 193 F.R.D. 568, 570 (S.D.Ind.1999) (investigation undertaken by an insurer to determine whether there is coverage or whether a claim should be paid is not undertaken in anticipation of litigation within the meaning of the work product rule); *Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 115 (N.D.Ga.1972)(insurer's evaluation of a routine claim from a policyholder is not undertaken in anticipation of litigation, though litigation often does result from denial of a claim)

It is undisputed that the Cabanas Memo was prepared on February 24, 2000 – nearly two months *before* the Plaintiff's claim was denied. At her deposition on January 24, 2001, the Provident's claims adjuster, Tammy Kidwill, testified that the Cabanas Memo was prepared for her as part of her *claims* investigation. Her supervisor, Kym Davis, testified that the Cabanas Memo was prepared in the Provident's ordinary course of business and that there was nothing distinctive about the Plaintiff's claim that precipitated the Cabanas interview; and the Provident's Appeals Supervisor, Rebeca Absher, testified that the Cabanas Memo contains the substance of his conversations with the Plaintiff. Each of the Provident's witnesses also testified that they had reviewed the memo prior to their depositions.[2]

The Cabanas Memo is therefore not work product because it was prepared in the ordinary course of the Provident's investigation of the Plaintiff's insurance claim and was written during that

---

[2]    While the testimony of these Provident employees is not in dispute, Plaintiff will be filing the relevant portions of Tammy Kidwill's deposition once the transcript is received on Tuesday, February 6, 2001. The other witnesses' testimony is presently available only on videotape.

investigation nearly two months before the claim was denied. Even if the Memo, for the sake of argument, were to contain Sergio Cabanas's mental impressions and opinions, as the Provident now alleges, it is still not work product if the alleged mental impressions and opinions concern only the Merrill Crews' insurance claim and not the prospect of litigation. Fed.R.Civ.P. 26(b)(3) Adv. Cmtee. Note ("Materials assembled in the ordinary course of business ... or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision.").

The investigation and evaluation of claims is part of the regular, ordinary and principal business of insurance companies. *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 422 (S.D.N.Y. 1981). An investigator's report prepared while the insurer is in the process of adjusting a claim and before the insurer has decided whether to pay the loss or to become involved in litigation, is prepared in the ordinary course of the insurer's business, and not in anticipation of trial, and is thus not work product. *State Farm Fire and Cas. Co. v. Perrigan*, 102 F.R.D. 235 (W.D.Va.1984); *Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420 (S.D.N.Y. 1981).

An investigation that is undertaken by an insurer to determine whether there is coverage, whether a claim should be paid, or whether a subrogation claim could be pursued, is not undertaken "in anticipation of litigation" within the meaning of the work product rule. *Nicklasch v. JLG Industries, Inc.*, 193 F.R.D. 568 (S.D.Ind.1999)(emphasis added). Claims that litigation became a realistic possibility at a certain time will normally have to be supported by affidavits giving specific factual detail. *Taroli v. General Elec. Co.*, 114 F.R.D. 97, 99 (N.D.Ind. 1987) aff'd. without opinion 840 F.2d 970 (7th Cir. 1988). The Provident has filed no such affidavits.

In fact the Provident, as the party opposing discovery, has failed to substantiate its work product claim in any way. The party resisting discovery bears the burden of demonstrating the applicability of the work product doctrine by proving that the withheld documents were prepared in

anticipation of litigation or for trial by that party or the party's representative. *Auto Owners*, 135

F.R.D. at 201. This is done through the filing of affidavits or other testimony substantiating the work

product allegation. *Id.* See also *Joyner v. Continental Ins. Cos.*, 1010 F.R.D. 414, 416-7 (S.D.Ga.

1983) (affidavit of insurance adjuster filed to support contention that certain documents were

prepared in anticipation of litigation); *Lett v. State Farm Fire and Cas. Co.*, 115 F.R.D. 501, 503

(N.D.Ga. 1987) (deposition of claims adjuster).

The Provident has filed nothing. It has simply made an unsubstantiated allegation that the

Cabanas Memo contains "information gathered by Mr. Cabanas, together with his mental

impressions and opinions."[3] But the Provident's work product claim remains just that – a claim –

because it has not provided the Court with *any* evidence of the content of the Cabanas Memo, and

in failing to do that – either by affidavit or deposition testimony – it has completely failed to meet

its burden. An unsubstantiated claim that a document is work product is *per se* insufficient,

particularly where the date of the document and the circumstances of its writing make it clear that

the work product claim is unjustified. The Provident should therefore be ordered to produce the

memo without further delay.

Lastly, independent of any of the preceding arguments for the production of the entire

Cabanas Memo and its attachments, the Plaintiff is entitled to obtain all portions of the memo that

contain the Plaintiff's own statements, since Fed.R.Civ.P. 26(b)(3) requires the production all

statements made by a party, even if those statements were obtained in anticipation of litigation: "A

party may obtain without the required showing a statement concerning the action or its subject matter

---

[3]  Defendant's Memorandum in Opposition, p. 4. Of course, the Provident neglected to tell the Court that
the *information* contained in the memo was gathered from *the Plaintiff*. This description is also different
from the one in the Defendant's Privilege Log, which describes the memo and attachments simply as
"claims information/claims handling."

previously made by that party." The Plaintiff would also be entitled to obtain all other portions of the Cabanas Memo that contain discoverable facts. *Joyner* at 417. (When work product contains both discoverable facts and mental impressions, the court may make an in camera investigation and extricate the protected parts.)

    2.    <u>The Provident's Claims Handling Policies and Procedures/Procedure Manuals</u>. The Provident's argument appears to be that its claims manuals and policies and procedures (all of which are still unidentified) are not admissible at trial and therefore cannot possibly be relevant or discoverable. And in support of this backwards argument, the Provident makes wild suppositions about the Plaintiff's trial strategy – as if the Court did not exist to govern trial – and then chastises the Plaintiff for speculating about the contents of manuals the Defendant has not deigned to identify.

    This is a breach of contract action. The issue in this case is not just whether Merrill Crews met the policy definition of "totally disabled" – as the Provident would like to believe – it is also whether or not the Provident failed to meet its obligations to its insured, Merrill Crews.

    At trial, the Defendant's claims adjuster can reasonably be expected to testify – as she did at her deposition on January 24, 2001 – that the Provident determined Merrill Crews was not disabled after a thorough investigation. To the extent the Provident's claims manuals and policies and procedures discuss how that investigation should have been performed and how the policy definitions are to be interpreted and applied following it, they are admissible for use as impeachment.

    But again, contrary to the Provident's attempt to limit the focus of the Court to trial, this is discovery, and the standard for discovery is relevance, not admissibility. It is absurd for the Provident to argue that its claims manuals and policies and procedures are not relevant to how the company handles claims and applies its own contract terms and obligations. Even if the manuals are

not themselves admissible, the information they are likely to contain will assist the Plaintiff in focusing his future discovery requests and depositions. In short, the Plaintiff's request for these manuals was reasonably calculated *to lead to* the discovery of admissible evidence and their production serves the purpose of narrowing the issues in this lawsuit. Admissible or not, they are clearly discoverable.

The Plaintiff in its Motion to Compel and here has made a *prima facie* showing that the Provident's claims manuals and policies and procedures are relevant to a claim or defense. The Plaintiff's request is limited to only those manuals that "pertain to the method and manner by which The Provident was to handle this disability claim." (Plaintiff's Interrogatory No. 7.) As the party claiming that the requested discovery is not relevant, the Provident has the burden to show that the discovery is outside the scope of the rules. *City of Wichita v. Aero Holdings, Inc.*, 192 F.R.D. 300, 302 (D.Kan. 2000). Again it has not met *its* burden. The Provident should therefore be compelled to answer Plaintiff's Interrogatory No. 7 and produce those policies and procedures or claims manuals that are responsive to it.

Finally, if the Provident's disability policy were as clear as the Defendant claims, it would not have needed to create the "illuminated" version with margin notes and explanations of terms that is attached here as Exhibit B. This engrossed policy was recently disclosed by the Provident and appears to be from a claim manual, based on the page numbering. It had previously been withheld as work product. It is also a prime example of the type of claims handling information the Plaintiff has requested, and the Defendant does not believe is relevant.

3.     Better Answers to Interrogatories 3, 5 and 6.     Contrary to the Defendant's Memorandum in Opposition, these interrogatory answers, which were inadequate when the Provident was withholding 108 pages of documents and refusing to produce its employees for deposition, have not improved now that the Defendant has met some of its other discovery obligations.

In the Interrogatories at issue, the Plaintiff asked the Provident to identify the employees involved first in handling Merrill Crews' claim[4] and then in denying it (No. 6); to describe what those employees did (Nos. 3 and 6); and to identify the documents the Provident reviewed or relied on in preparing its answers to interrogatories and its answer and affirmative defenses (No. 5).

The Plaintiff is entitled to answers under oath to these very basic questions so there is no surprise later should the Provident appear with a previously undisclosed witness, document or material fact.  While the Federal Rules of Civil Procedure do permit a party to refer to a particular document in lieu of answering an interrogatory, they also require the party doing so to specifically identify the document that contains the responsive information in order to limit the answer and prevent surprise. *Olson v. Kmart Corp.*, 175 F.R.D. 560, 564 (D.Kan. 1997).

If the Provident wishes to refer to its claims records in lieu of answering Interrogatories 3, 5 and 6 directly, it should be ordered to identify the particular documents that contain the requested information.  Otherwise, the Provident should be required to answer these interrogatories with the specificity required by the Rules of Civil Procedure.

---

[4]     Interrogatory No. 2 asked the Provident to identify the names and addresses of those persons who were involved in handling the Plaintiff's claim. This information is incorporated into Interrogatory No. 3. The Provident provided no addresses and omitted six of its own employees from its answer– five were discovered in the Provident's privilege log and a sixth was disclosed during the deposition of Provident employee Rebeca Absher. This is why the Plaintiff needs specific and detailed interrogatory answers from this Defendant.

CASE NO. 00-4182-CIV-MIDDLEBROOKS
Page 10

## CONCLUSION

Plaintiff Merrill Crews respectfully moves this Court to grant his Motion to Compel Discovery in all respects and to order Defendant The Provident Life and Accident Insurance Company to provide:

1.     The complete 2/24/00 memorandum from Sergio Cabanas to Tammy Kidwill, with all attachments;

2.     All claims manuals or policies and procedures that pertain to the method and manner by which The Provident was to handle this disability claim; and

3.     Better answers to Plaintiff's Interrogatories Nos. 3, 5, 6, and 7

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this February 3, 2001 to: John E. Meagher, Esq. and Jeffrey Landau, Esq., Shutts & Bowen, LLP, 201 S. Biscayne Boulevard, 1500 Miami Center, Miami, Florida 33131.

Respectfully submitted,

NEEDLE GALLAGHER & ELLENBERG, P.A.
Attorneys for Plaintiff
1401 Brickell Avenue, Suite 900
Miami, Florida 33131
Telephone - (305) 530-0000

By: _____
          WILLIAM G. WOLK
          Fla. Bar No: 103527

**PROVIDENT**

## MEMO OF TELEPHONE CONVERSATION          RISK MANAGEMENT

Time _9:00_    Date _1/20/00_

Person Calling _Sergio (FIELD)_    Office _____

Person Called _JR_    Office _____

Subject: _Crews_

Message: _Help - he is reviewing, this case - call to discuss ☺ (954)447-6998._

_JR_

_RC - 10:18 1/20/00 - he RC - he will call a sch. appt - clarify - 000 ☺ time of disability_

_he will keep me updated -_

_JR_

_1/20/00   6:10 + 6.20.  he called + LM. he met w/ insured @ 3:30 + guol furnished interview - elt was agcd interview - insured was very cooperative - Sergio inquired about insureds work history - insured seen for office a lot - He will have report soon - call w/ questions (954) 447-6998 -_

_JR_

PLACL00 123

Exhibit "A"

1074 (Rev. 5-99)

PLACL00439

*New exclusions.*

*Additional exclusions. If any, appear in the Policy Schedule.*

*Built in option*

*Pays during the EP*

## EXCLUSION

We will not pay benefits for loss caused by war or any act of war, whether war is declared or not.

Additional exclusions, if any, appear in the Policy Schedule.

### PRE-EXISTING CONDITION LIMITATION

We will not pay benefits for loss starting within two years of the Effective Date of this policy which is caused by a *Pre-existing Condition.* A claim for benefits for loss starting thereafter will not be reduced or denied on the ground it is caused by a *Pre-existing Condition* unless the condition is excluded by name or specific description. *Pre-existing Condition* means a physical impairment, deformity or a medical condition that was misrepresented or not disclosed in the application, and was a sickness or physical condition for which either: 1) resulted in your receiving medical advice or treatment; or 2) caused symptoms for which an ordinarily prudent person would seek medical advice or treatment.

## BENEFITS

### TOTAL DISABILITY
We will pay the Monthly Benefit for Total Disability shown on Page 1 as follows:

1. Benefits start on the day of Total Disability following the *Elimination Period.*
2. Benefits will continue while you are totally disabled during the period of disability but not beyond the Maximum Benefit Period.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one Injury or Sickness or from both will not matter. We will pay benefit for the disability which provides the greater benefit.

### PRESUMPTIVE TOTAL DISABILITY – LOSS OF SPEECH, HEARING, SIGHT OR THE USE OF TWO LIMBS
You will be presumed totally disabled if Injuries or Sickness results in the entire and permanent loss of:

1. speech;
2. hearing in both ears;
3. the sight of both eyes; or
4. the use of both hands, or of both feet, or of one hand and one foot.

You must present satisfactory proof of your loss. Your ability to work will not matter. Further medical care will not be required. Benefits will be paid according to the Total Disability provisions of this policy. But, benefits will start on the date of loss if earlier than the day benefits start as shown on Page 1). If loss occurs before you attain age 65, the Monthly Benefit for Total Disability will be paid as long as you live regardless of the Maximum Benefit Period shown on Page 1.

*Pays for life even if Policy ends @ 65*

*Pays even if you can work.*

*Provides full Total Disability payments.*

335-E-1

JOHN PROVIDENT    8-355-721628    Page 5

621

Exhibit "B"

PLAC.00440

*[Handwritten annotations:]*

*Own Occ*
*to end of Benifit (period) if not totally disabled*

*Best definition available*
*if you can work in another occupation.*

*own occ / if the disability is not totally disabled — EP starts over*

*No new elimination period for related disabilities occurring within twelve months of a previous disability.*

# DEFINITIONS

**Injuries** means accidental bodily injuries occurring while your policy is in force.

**Sickness** means sickness or disease which is first manifested while your policy is in force.

**Age,** when used before a number, such as in "age 65", means the ending date of the page policy term in which you attain that age. A policy term is described on the page titled "Premiums and Renewals."

**Physician** means any person other than you who is licensed by law, and is acting within the scope of the license, to treat Injuries or Sickness which results in covered loss.

**Total disability or totally disabled** means that due to Injuries or Sickness:

1.  **you are not able to perform the substantial and material duties of your occupation;** and

2.  you are receiving care by a Physician which is appropriate for the condition causing the disability.

**your occupation** means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

**period of disability** means a period of disability starting while this policy is in force. Successive periods will be deemed to be the same period unless the later period:

1.  is due to a different or unrelated cause; or

2.  starts more than twelve months after the end of the previous period.

In which event, the later period will be a new or separate period of disability. A new Elimination Period must then be met. And, a new Maximum Benefit Period will apply.

**Elimination Period** means the number of days of disability that must elapse in a period of disability before benefits become payable. The number of days is shown on Page 3. These days need not be consecutive; they can be accumulated during a period of disability to satisfy an Elimination Period. Benefits are not payable, nor do they accrue, during an Elimination Period.

*Benefits are payable as a sickness.*

*You pay no premiums, even beyond the benefit period. (This provision is even broader when the residual option is included.)*

**TRANSPLANT SURGERY**
You might be disabled from the transplant of part of your body to another person. If so, we will consider it to be the result of a sickness.

**COSMETIC SURGERY**
You might be disabled from surgery to improve your appearance or to correct disfigurement. If so, we will consider it to be the result of a sickness.

**PREGNANCY**
You might be disabled from pregnancy or childbirth. If so, we will consider it to be the result of a sickness.

**WAIVER OF PREMIUM**
After you have been totally disabled for 90 days during a period of disability, we will:

1. refund any premiums which became due and were paid while you were totally disabled; and
2. waive the payment of each premium which thereafter becomes due for as long as the period of disability lasts. After it ends, to keep this policy in force, you must again pay any premium which become due.

for premiums to be waived, you must give us satisfactory proof of disability.

**REHABILITATION** — Your participation in a program of occupational rehabilitation will not of itself be considered a recovery from Total Disability.

**Expense** — If, during a period of Total Disability, you participate in a program of occupational rehabilitation which we approve, we will pay for certain expenses you incur. That is, we will pay for the reasonable cost of training and education which is not otherwise Covered under Health Care Insurance, Workers' Compensation, or any public fund or program. But, we will not pay more than the Maximum Amount for Rehabilitation Expense shown on Page 1.

A program of occupational rehabilitation must be designed to help you return to work and be:

1. a formal program of rehabilitation at an accredited graduate school, college or business school; or at a licensed vocational school;
2. a recognized program operated by the federal or a state government; or
3. any other professionally planned rehabilitation program of training or education.

*Policy benefits still payable.*

*Plus an additional benefit.*

PLACL00438

623



A built-in feature.

*Continuing total disability protection for those who wish to postpone retirement.*

must be due

to can acc debt.

NOI

#2500 MAX

**TREATMENT OF INJURIES (PAYABLE IF DISABILITY BENEFITS NOT PAID.)**
If injuries require medical treatment prescribed by a Physician, we will pay your expenses for the treatment. But, we will not pay more than the Maximum Amount for Treatment of Injuries shown on Page 3 as a result of any one accident.

If you qualify for payment under this provision and also under a disability provision of this policy because of the same accident, payment will be paid under the provision which provides the greater benefit.

**BENEFITS WHEN POLICY RENEWED AFTER AGE 65**
If this policy is continued in accordance with the "Conditional Right to Renew After Age 65" on Page 1, all of the benefit provisions on Pages 3, 6 and 7 will be included in the continued policy. (Any additional benefit provision contained in this policy will not be included unless it is named on Page 1 as one that will be included in the continued policy.) The Maximum Benefit Period starting while this policy is continued is shown on Page 1. The Monthly Benefit for Total Disability will not change unless you chose to renew with a lesser amount.

**PAYMENT FOR PART OF MONTH**
If any payment under this policy is for part of a month, the daily rate will be 1/30th of the payment which would have been made if disability had continued for the whole month.

need copies of Medical bills &
DX has to be on Indemnities bill...

must work @least 30 hrs/wk.

335-82          JOHN PROVIDENT          4-335-726428          Page 7

10

PLACL00437

624

PLACL.00436

**RESIDUAL DISABILITY BENEFITS** with Recovery Benefits and with Cost of Living Indexing of Prior Monthly Income (Nothing in this provision limits the policy definition of Total Disability.)

## DEFINITIONS

*This option does not change the definition of Total Disability stated in your policy.*

**Monthly Income** means your monthly income from salary, wages, bonuses, commissions, fees or other payments for services which you render. Normal and usual business expenses are to be deducted. Income taxes are not. Monthly Income must be earned. It does not include dividends, rents, royalties, annuities or other form of unearned income.

Monthly Income can be credited to the period in which it is actually received or to the period in which it is earned. We also allow either the cash or accrual accounting method. But, the same method must be used to determine the Prior Monthly Income and the Current Monthly Income during a period of disability.

*We provide the widest variety of definitions of prior monthly income.*

**Prior Monthly Income** means the greatest of:

1. your average Monthly Income for the 12 months just prior to the start of the period of disability for which claim is made;
2. your average Monthly Income for the year with the highest earnings of the last five years prior to the start of such period of disability; or
3. your highest average Monthly Income for any of the successive years of the last five years prior to the start of such period of disability.

**Current Monthly Income** means your Monthly Income for each month of Residual Disability being claimed.

*Minimum loss of earnings required is 20%.*

**Loss of Monthly Income** means the difference between Prior Monthly Income and Current Monthly Income. Loss of Monthly Income must be caused by the Residual Disability for which claim is made. The amount of the loss must be at least 20% of Prior Monthly Income to be deemed loss of Monthly Income. If your loss is more than 75% of Prior Monthly Income, we will deem the loss to be 100%.

*More than 75% = 100%*

**Residual Disability** or residually disabled, during the Elimination Period, means that due to injuries or sickness:

*Does not require a loss of time or duties.*

1. you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
2. you are losing at least 20% of your Monthly Income in your occupation of at least 20%; and
3. you are receiving care by a Physician which is appropriate for the condition causing the disability.

After the Elimination Period has been satisfied, you are no longer required to have a loss of duties or time. Residual Disability or residually disabled then means that due to injuries or sickness:

1. you have a loss of Monthly Income in your occupation of at least 20%; and
2. you are receiving care by a Physician which is appropriate for the condition causing the disability.

627

Monthly Benefit for Total Disability is shown on Page 1. (It can be increased by certain other benefit provisions if they are included in your policy and are applicable. It includes the "Cost of Living Adjustment of Monthly Benefits" and "Social Insurance Substitute Benefit.")

Residual Disability Monthly Benefit is the benefit payable under this provision. It is determined monthly by this formula. Each month, it equals:

$$\text{Loss of Monthly Income} \times \text{Monthly Benefit for Total Disability}$$
$$\text{Prior Monthly Income}$$

## RESIDUAL DISABILITY BENEFITS

We will pay Residual Disability Monthly Benefits as follows:

1. Benefits start on the day of Residual Disability following the Elimination Period or, if later, after the end of compensable Total Disability during the same period of disability.

2. Benefits will continue while you are residually disabled during a period of disability but the combined period for which benefits for Total and Residual Disability are payable cannot exceed the Maximum Benefit Period. And benefits will not be payable after you attain age 65.

3. The first six monthly payments for Residual Disability will be the greater of:
   a. 50% of the Monthly Benefit for Total Disability; or
   b. the Residual Disability Monthly Benefit determined for each month.

Residual Disability benefits will not be paid for any days for which Total Disability benefits are paid.

In no event will you be considered to have more than one disability at the same time. The fact that a disability is caused by more than one injury or sickness or from both will not make us liable to pay benefits for the disability which provides the greater benefit.

We can require any proof which we consider necessary to determine your Current Monthly Income and Prior Monthly Income. Also, we or an independent accountant retained by us shall have the right to examine your financial records as often as we may reasonably require.

## RECOVERY BENEFITS

If you are under age 65 and return to gainful full-time work at the end of a period for which we have paid Total and/or Residual Disability Benefits, we will:

1. while you are so engaged in gainful full-time work; and
   while you are having a loss of Monthly Income of at least 20% due to the same injuries or sickness;

pay benefits under this back to work provision as though the same period of disability is continuing. Payments will be made for each month, up to 3 months, in which (1) and (2) exist. For the first such month, we will pay a benefit based on the greater of:

PLACL00435

14

628

*Minimum of 50% benefit during first six months.*

*To financially ease your transition from disability to recovery, we provide a recovery feature which pays benefits for up to 3 months. Does not require a "care by a physician." "Does not require a loss of time or duties."*

PLACL00434

*A unique part of this Residual option. Protects your benefits from the eroding effects of inflation.*

*π (of 3 months) for Total D)*

*1st (of 3 months) Tot.*
*1st month Tot.*

a. the monthly rate computed by the Residual Disability Benefit formula for that month; or
b. 100% of the actual claim payment made for the 10 days preceding your return to work full time.

The monthly benefit for the second and third months will be computed as in (a) and (b) above; except that, instead of using 100% in (b), 75% will apply for the second month. And, 50% will apply for the third month.

These recovery benefits will not be paid for any days for which Total and/or Residual Disability benefits are paid. And they will not be paid for more than 3 months in connection with a period of disability.

---COST OF LIVING INDEXING OF PRIOR MONTHLY INCOME
(Applicable to benefits paid after the 12th month of a period of disability)

Definitions

CPI-U means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If the CPI-U is discontinued or if its method of computation is changed, we may use another nationally published index. We will choose an index which is similar in scope and purpose to the CPI-U. The CPI-U will then mean the index which is chosen.

Index Factor is used by us to determine your adjusted Prior Monthly Income for each Review Period. We will compute this Factor by dividing the CPI-U for the latest Index Month by the CPI-U for the first Index Month. We will compute it on each Review Date during a period of disability.

Review Date means each anniversary date of the start of a period of disability.

Review Period means a one year period ending on a Review Date.

Index Month means the calendar month three months prior to a Review Date. But, the first Index Month means the calendar month three months prior to the start of a period of disability. We will measure all changes in the CPI-U from the first Index Month.

Adjusted Prior Monthly Income

If injuries or sickness results in a period of disability that lasts at least 12 months, we will compute Cost of Living adjustments on each Review Date for Residual Disability benefits. Monthly benefits which thereafter accrue during that period of disability will be adjusted by indexing your Prior Monthly Income as follows:

1. On each Review Date, your Prior Monthly Income will be multiplied by your Index Factor. The result is your adjusted Prior Monthly Income. It will be used to figure your Residual Monthly Income during the Review Period that follows. It will also be used in the formula to compute each Residual Disability Monthly benefit payable during that Review Period.

*After 1 yr. Indexing of Prior Monthly income automatically included.*

315-MIS          JOHN PROVIDENT          4-315-221628          Page 12

*broadens the waiver in your basic policy.*

*Other than the CPI-U, there is no cap on Prior Monthly Income.*

Eno Residual

An increase in your Prior Monthly Income can cause your loss of Monthly Income to be greater. This in turn can result in an increase in your Residual Disability Benefit. Other than the percent of increase limit we use (using actual CPI-U values), there is no limit on the percent of increase in your Prior Monthly Income for a Review Period. If the CPI-U should go down, your adjusted Prior Monthly Income can decrease, but, it can never reduce below your Prior Monthly Income at the start of the period of disability.

2.  Indexing of your Prior Monthly Income will end on the earliest of:

   a.  the end of the period of disability (see Page 6);
   b.  the end of a benefit period; or
   c.  the date you attain age 65.

If the computations end and because a or b above, disability benefits which can be paid for the first 12 months of a new period of disability will not include a Cost-of-Living Adjustment. A new first Index Month and Review Date will apply to each new period of disability that lasts more than 12 months.

**WAIVER OF PREMIUM**

for periods of disability which start before age 65, the Waiver of Premium provision on Page 6 is replaced by the following:

**"WAIVER OF PREMIUM - TOTAL DISABILITY AND RESIDUAL DISABILITY**

If, during a period of disability, Injuries or Sickness results in more than 90 days of Total and/or Residual Disability, we will:

1.  refund any premiums which became due and were paid while you were so disabled; and

2.  waive the payment of each premium which thereafter becomes due for so long as the period of disability lasts. After it ends, to keep your policy in force, you must again pay any premiums which become due.

For premiums to be waived, you must give us satisfactory proof of disability except as respects Recovery benefits."

NOTE: All portions of this Residual Disability Benefit expire when you attain age 65 even though the policy may be renewed after you attain age 65. No further premiums for it will be due.

JJY-RES     JOHN PROVIDENT    4-333-721628    Page 11

16

PLAC 00433

COLA (w/) CPI

PLACL00432

## COST OF LIVING ADJUSTMENTS WITH GUARANTEED PERCENTAGE INCREASE OPTION
(Applies to benefits payable after the 12th month of a period of disability)

### DEFINITIONS

**CPI-U** means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If the CPI-U is discontinued or if it is otherwise computed and/or changed, we may use another nationally published index. If we select an index which is similar in scope and purpose to the CPI-U, the CPI-U will then mean the index which is chosen.

**Review Date** means each anniversary date of the start of a period of disability.

**Review Period** means a one year period ending on a Review Date.

**Index Month** means the calendar month three months prior to a Review Date. But, the first Index Month means the calendar month three months prior to the start of a period of disability. We will measure all changes in the CPI-U from the first Index Month.

**Benefit Factor** is determined by dividing the CPI-U for the latest Index Month by the CPI-U for the first Index Month. We will compute it on each Review Date during a period of disability. If it will apply to the Review Period that follows.

**Monthly Benefit for Total Disability** is shown on Page 3. (It can be increased by a "Special Insurance Substitute (SIS) Benefit" if it is included in your policy and when it is applicable.)

**Adjusted Monthly Benefit for Total Disability** is the Monthly Benefit for Total Disability multiplied by the Benefit Factor for a Review Period. But, an Adjusted Monthly Benefit for Total Disability can not:

1. exceed the Monthly Benefit for Total Disability increased by a percentage factor equal to the completed number of Review Periods, multiplied by the percentage shown on Page 3 as the Maximum COLA Percentage; or

2. be less than the amount of the Monthly Benefit for Total Disability increased by a percentage factor equal to the completed number of Review Periods multiplied by 4%.

### BENEFITS

If injuries or sickness results in a period of disability that lasts at least 12 months, we will compute Cost of Living Adjustments on each Review Date. Monthly benefits which thereafter accrue during that period of disability will be adjusted as follows:

1. On each Review Date, we will compute the Benefit Factor and the Adjusted Monthly Benefit for Total Disability for the Review Period that follows.

2. For any Monthly Benefit for Total Disability that accrues during a Review Period, we will pay instead the Adjusted Monthly Benefit for Total Disability.

335-C01A/CPI-88                        JOHN PROVIDENT      4-335-722628                          Page 14

---

*Benefit increases are based on changes in the Consumer Price Index.*

*Minimum percentage factor is 4%*

*Full "your OCC" benefits.*

633

*Cost of Living increases also available when you're residually disabled.*

*You may increase your basic Monthly Benefit to the amount of the last monthly benefit adjusted by COLA.*

*(This feature is not included with 5 year benefit periods.)*



5. We will adjust any Residual Disability Monthly Benefit which accrues during a Review Period. To do this, we will use the Adjusted Monthly Benefit for Total Disability in the formula to determine each Residual Disability Monthly Benefit. It will be used during that Review Period. It will be used in the formula instead of the Monthly Benefit for Total Disability.

4. Computations of Cost of Living Adjustments will end on the earliest of:

   a. the end of the period of disability (see Page 4);
   b. the end of a benefit period; or
   c. the date you attain age 65.

If the computations end because of (a) or (b) above, benefit amounts will revert to those shown on Page 3. Benefits payable for the first 12 months of a new period of disability will not include a Cost of Living Adjustment. A new first Index Month and Review Date will apply to each new period of disability that lasts more than 12 months.

If the computations end because of (c) above and if any disability benefits continue to be payable after you attain age 65 for a period of disability that started before you became age 65, we will apply to those benefits the benefit factor that last applied before you became age 65.

We will compute a benefit factor on the first Review Date for a period of disability that starts on or after your 65th birthday. This factor will continue to apply to any benefits paid during that period of disability.

**QUALIFIED RIGHT TO INCREASE MONTHLY BENEFIT TO ADJUSTED AMOUNT**

When you return to active and continual full-time work after the end of a period of disability during which Cost of Living Adjustments were made, you may elect to increase the amount of the Monthly Benefit for Total Disability shown on Page 3. You may increase it to the amount of the Adjusted Monthly Benefit for Total Disability which was used to determine the last monthly benefit payment if it is greater and if:

   1. you have not reached your 60th birthday on the date you elect the increase; and
   2. within 90 days after the period of disability ends, you make application to us on a form which we will furnish you upon request. On this form, you must confirm that you are actively and genuinely employed full time. Other evidence of insurability will not be required.

The effective date of the increase will be the first of the month after we approve your application for the increase. The required additional premium must be paid within 31 days of that date. Later premiums for the increase must be paid as part of the renewal premium for the policy.

The premium for the increase will be based on your attained age at the time of the increase. It will also be based on our table of premium rates then in effect.

The increase in benefits will apply to new periods of disability which start after the effective date of the increase.

If you do not elect and obtain this increase, the Monthly Benefit for Total Disability will revert to the amount shown on Page 3 for new periods of disability.

PLACL00431

634

'ais you select a COLA rate appropriate with today's ratio of inflation and guarantees the right to increase your protection as you need it to as much as 12% —without physical or financial underwriting.

PL ACLI 000430

## GPI

### GUARANTEED PERCENTAGE INCREASE OPTION

**Definitions**

Option Date means each anniversary of the Effective Date of the policy starting with the first and ending with the anniversary which falls on or next follows your 60th birthday. If an Option Date does not coincide with a renewal date for this policy, it will change to coincide with the next renewal date thereafter.

Option Period means the period which begins 60 days before and ends 31 days after an Option Date.

You have the right to increase the Maximum COLA Percentage shown on Page 3 by the Available Guaranteed Percentage Increase (GPI) also shown on Page 3. You may do this, without submitting evidence of insurability, by following the rules set forth below.

An increase can be for the available GPI or for part of it in increments of 2%.

The request for an increase must be made within an Option Period. It must be a dated written request signed by you. An increase will be effective: (a) on the Option Date if your request is made before that date; or (b) on the date of your request if it is made within 31 days after the Option Date.

You can request an increase during any Option Period even if you are disabled, but the increase will apply only to a period of disability which starts after the effective date of the increase. It must qualify as a separate period of disability (see Page 4).

**Exercising Increase Option**

The premium for each increase of the Maximum COLA Percentage will be based on your attained age at the time of each increase. It will also be based on:

1. our premium rates in effect at the time of the increase or on the Effective Date of the policy, whichever is less; and
2. your occupational class at the time of the increase or on the Effective Date of the policy, whichever will produce the lower premium.

The first premium for an increase must be paid within 31 days after the effective date of the increase (and the balance of premium must be paid as part of the Policy Premium). If the premium for the policy is being waived (see Waiver of Premium provision) on the effective date of the increase, you will not have to start paying the premium for the increase until the increase becomes payable again.

When the Maximum COLA Percentage is increased, the premium for this GPI Option is reduced by the charge that was being made for the GPI percentage which was exercised. The reduced premium will be based on the Available GPI remaining, if any.

**Option Expiration Date**

This GPI Option will expire, and no further premiums for it will be due, on the earlier of: (a) the date when the full Available GPI has been exercised; or (b) the date when the Option Period ends for the age 60 Option Date described above.

NOTE: The GPI portion of this benefit provision and its premium will cease as stated above. The COLA portion continues until you attain age 65 when it and the premium for it will terminate, even though the policy may be renewed after you attain age 65.

635

permanent provision to keep your
y in force.

## PREMIUMS AND RENEWALS

**POLICY TERM**
The first term of this policy starts on the Effective Date shown on Page 3. It ends on the first Renewal Date after that shown. Later terms will be the periods for which you pay renewal premiums when due. All terms will begin and end at 12:01 A.M. Standard Time, at your home. The renewal premium for each term will be due on the day the preceding term ends, subject to the grace period.

**GRACE PERIOD**
This policy has a 31 day grace period. This means that if a renewal premium is not paid on or before the date it is due, it may be paid during the next 31 days. During the grace period, the policy will stay in force.

**CONDITIONAL RIGHT TO RENEW AFTER AGE 65; PREMIUMS ARE NOT GUARANTEED**
(Continued from Page 1)
You can renew this policy as long as you are actively and gainfully working full time. From time to time, we can require proof that you are actively and gainfully working full time. If you stop working, (except by reason of Total Disability), this policy will terminate, except that coverage will continue to the end of any period for which premium has been accepted.

Premiums must be paid on time. They will be based on our table of rates by attained age in effect at time of renewal for persons in your same rate class who are insured under policies of this form. Other than your attained age, the factors used to determine your rate class will be the same as those that applied to you on the Effective Date of this policy.

The benefit provisions which will be included in this policy, if it is continued after you attain age 65, are described on Page 7.

**REINSTATEMENT**
If a renewal premium is not paid before the grace period ends, the policy will lapse. Later acceptance of the premium by us or by our agent authorized to accept payment without requiring an application for reinstatement will reinstate this policy.

If we or our agent require an application, you will be given a conditional receipt for the premium tendered. If the application is approved, the policy will be reinstated on the date of the approval. Lacking such approval, the policy will be reinstated on the 45th day after the date of the conditional receipt unless we have previously written you of our disapproval.

The reinstated policy will cover only loss that results from injuries which occur after the date of reinstatement or sickness which is first manifested more than 10 days after such date. In all other respects, your rights and ours will remain the same, subject to any provisions noted on or attached to the reinstated policy.

PLACL00429

638

*liberal military service provision. Coverage may be continued or suspended.*

*Prompt handling of claims is guaranteed.*

PLACL00428

## SUSPENSION DURING MILITARY SERVICE

If you enter full-time active duty in the military (land, sea or air) service of any nation or international authority, you may suspend your policy. But, you may not suspend the policy during active duty for training lasting 3 months or less. We will not pay any benefit for a loss which is suspended. And you will not be required to pay premiums. If, upon receipt of your written request, we suspend the policy, we will refund the pro-rata portion of any premium paid for a period beyond the date we receive your request.

If your full-time active duty in military service ends before age 65, you may place this policy back in force without evidence of insurability. Your coverage will start again when:

1. we have received your written request to place the policy back in force; and
2. you have paid the required pro-rata premium for coverage until the next premium due date.

However, your request and premium payment must be received by us within 90 days after the date your active duty in the military service ends. Premium will be at the same rate that they would have been had your policy remained in force. The policy will not cover any loss due to injuries which occur or sickness which is first manifested while the policy is suspended. In all other respects you and we will have the same rights under the policy as before it was suspended.

## PREMIUM ADJUSTMENT AT DEATH

Any premium paid for a period beyond the date of your death will be refunded to your estate.

## CLAIMS

## NOTICE OF CLAIM

Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible. The notice can be given to us at our home office, Chattanooga, Tennessee, or to our agent. Notice should include your name and the policy number.

## CLAIM FORMS

When we receive your notice of claim, we will send you claim forms for filing proof of loss. If these are not given to you within 15 days, you will meet the proof of loss requirements by giving us a written statement of the nature and extent of your loss. You must give us this proof within the time set forth in the Proof of Loss section.

## PROOF OF LOSS

If the policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.

If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

113-C                          JOHN PROVIDENT        4-315-7221428                    Page 24

*After two years, no claims denied for pre-existing health conditions not excluded in your policy.*

BOE
Buy/Sell

PLACL00427

**TIME OF PAYMENT OF CLAIMS**
After we receive written proof of loss, we will pay monthly all benefits then due for disability. Benefits for any other loss covered by this policy will be paid as soon as we receive proper written proof.

**PAYMENT OF CLAIMS**
Benefits will be paid to you. Any benefits unpaid at death will be paid to your estate.

If benefits are payable to your estate, we can pay benefits up to $1000 to someone related to you by blood or marriage whom we consider to be entitled to the benefits. We will be discharged to the extent of any such payment made in good faith.

**PHYSICAL EXAMINATIONS**
We, at our expense, have the right to have you examined as often as is reasonable while a claim is pending.

JME

**MISSTATEMENT OF AGE**
If your age has been misstated, the benefits will be those the premium paid would have bought at the correct age.

**LEGAL ACTIONS**
You may not start a legal action to recover on this policy within 60 days after you give us required proof of loss. You may not start such action after three years from the time proof of loss is required.

## GENERAL PROVISIONS

**ENTIRE CONTRACT**
This policy with the application and attached papers is the entire contract between you and us. No change in this policy will be effective until approved by one of our officers. This approval must be noted on or attached to this policy. No agent may change this policy or waive any of its provisions.

**INCONTESTABLE**

1. After this policy has been in force for two years during your lifetime, we cannot contest the statements in the application.

2. No claim for loss incurred or disability that starts after two years from the Effective Date of this policy will be reduced or denied on the ground that a sickness or physical condition not excluded by name or specific description had existed before the Effective Date of this policy.

**CONFORMITY WITH STATE STATUTES**
Any provision of this policy which, on its effective date, is in conflict with the laws of the state in which you reside on that date is changed to conform to the minimum requirements of those laws.

**ASSIGNMENT**
No assignment of interest in this policy will be binding on us until a copy is on file with us. It must be approved by one of our officers. We are not responsible for the validity of any assignment.

335-GP                          JOHN PROVIDENT          4-335-721628                          Page 21